Miller vs. Handy, Sheriff, et al.

## No. 7982.

MRS. MARY E. MILLER, WIFE OF W. L. JACKSON, VS. T. H. HANDY, SHERIFF, ET AL. EXECUTORS OF PHILLIPS, INTERVENORS.

It is not incompatible with the wife's personal and sole administration of her paraphernal property, that she should employ her own husband as her agent for the purpose of that administration.

When the paraphernal property is thus administered by the husband, as agent of his wife, by virtue of a special and express power of attorney, and his administration is clearly and positively in her name, for her own account, and subject to her control and authority, the fruits of the property belong to her and not to the Community.

[Note of the Reporter]: The property in this case was a plantation situated in the State of Mississippi.

The wife has the right to buy property for her separate account, partly for cash and partly on credit, when she pays the cash portion of the price with her paraphernal funds, and has revenues derived from her paraphernal property, sufficient to pay the credit portions of the price when they become due.

The property thus bought by her is paraphernal.

General principles laid down by the Court to show when and how the wife may buy property for her separate account, on credit.

APPEAL from the Fourth District Court, parish of Orleans. *Houston, J.*

*B. F. Jonas* and *J. O. Nixon, Jr.*, for Plaintiff and Appellee.

We submit the following propositions:

First—The evidence is that Mrs. Jackson made two payments, one of $8500 in 1869, and one of $9000 in 1872, besides interest upon the house in controversy; and that those payments were made out of her own money.

Second—That the evidence is that she retained the administration and control of her own funds.

Third—That a married woman can purchase property partly on credit, provided her means and circumstances justify the investment. Lehman, Newgass & Co. vs. Mrs. Barrow, et ux., 23 A. 183; Jordan & Co. vs. Mrs. Anderson, 29 A. 749; Terell vs. Cutrer, 1 R. 367; Stroud vs. Humble, 2 A. 930; Dyson vs. Phelps, 14 A. 733; Succession of Pinard vs. Holten, 30 A. 167; Metcalf vs. Clark, 8 A. 286.

Fourth—That the evidence is that Mrs. Jackson's circumstances are such as to justify her purchase.

*Thos. J. Semmes,* for Intervenors.

Wife may, during the existence of the community, purchase on credit for investment of paraphernal funds, if she has at her disposal property reasonably sufficient to enable her to make the acquisition.

*G. L. Bright* and *D. N. Barrow,* for Defendants and Appellants.

First—Pleadings cannot be amended during the trial.

Second—Petition for injunction should not be amended, unless an affidavit be made to the allegations and causes necessitating the amendment.

Third—After a cause is taken under advisement, evidence should not be received.

Fourth—No part of the purchase price of the property was ever paid out of Mrs. Jackson's money. The cash payment by Mrs. Jackson, and the credit payments were made by mortgaging the same property, and but one of the mortgages has been paid, viz., that for $5000, and this was paid by the sale of part of the property purchased.

The opinion of the Court was delivered by

FENNER, J. We find in the record a lengthy and exceptionally able opinion by the District Judge, which presents a lucid statement of the complicated issues involved, as well as a masterly review of the evidence, and we shall avail ourselves of its contents in our statement of the case.

THE ISSUES.

"Certain judgment creditors of Wm. L. Jackson have seized, under "execution, a portion of ground, with improvements, situated at the "corner of Coliseum and Polymnia streets, in this city. The plaintiff, "the wife of Wm. L. Jackson, enjoins further proceedings against the "property under the executions against him, and prays to be recog-"nized as the owner thereof, and for damages for an illegal seizure of "her property. She alleges that she is separated in property from her "husband with whom she lives, in Adams county, Mississippi; that she "purchased the property from John S. Scott on the 18th of December, "1869 ; that she purchased it in her own name, with her own separate "paraphernal funds, which fact is recorded in the act of sale from Scott "to her ; that those paraphernal funds were the profits arising from the "cultivation of a cotton plantation owned by her and situated in "Adams county, Mississippi; that the said plantation, her separate "paraphernal property, was administered by her and not by her hus-"band."

The seizing judgment creditors of the husband defend, denying the allegations of the plaintiff's petition, and averring *per contra* that " Wm. " L. Jackson, on May 20, 1869, bought the property, and to conceal it, " and defraud his creditors, took title to it in the name of his friend and " partner, John S. Scott ; that on December 18, 1869, Scott, without con-" sideration, and at the request of Wm. L. Jackson, transferred it to " him by making title in the name of Mrs. Wm. L. Jackson, the plain-

11

" tiff; that all these acts were simulated and fraudulent; that the
" property was acquired during the existence of a community of acquets
" and gains between plaintiff and her husband, Wm. L. Jackson, and
" purchased with the funds of that community, and not with separate
" paraphernal funds of the plaintiff." They make other allegations as-
saulting the validity of the judgment of separation between plaintiff and
her husband, which seem irrelevent to the issues to be determined, be-
cause the rights of the wife originated before said judgment, and are, in
no manner, dependent upon its validity.

The defendants demand a dissolution of the plaintiff's injunction
and statutory damages.

" The testamentary executors of Mrs. Rosina Phillips have inter-
" vened herein by consent. They allege that the succession of Mrs. Ro-
" sina Phillips is the holder and owner of a note for $7000, dated Febru-
" ary 14, 1874, payable one year after date, drawn by plaintiff, Mrs. M.
" E. Jackson, authorized by her husband, and further authorized by the
" certificate of the Judge of the Sixth District Court for this parish, and
" secured by mortgage granted by Mrs. M. E. Jackson, plaintiff herein,
" on the property herein described; that on January 19, 1880, they, as
" executors, obtained judgment in suit No. 10,794 of the Sixth District
" Court, against M. E. Jackson *in personam*, for the amount of said
" note, with recognition of mortgage on the property herein described;
" that they caused execution to issue, and thereunder seized the prop-
" erty."

They espouse the side of the plaintiff in the original controversy,
asserting that the property is paraphernal, and not community, and,
therefore, responsible for the wife's, and not for the husband's, debts.
The plaintiff does not dispute the intervenors' claim.

The defendants, however, deny the allegations of the intervenors;
reiterate the defenses opposed by them to the plaintiff; and further set
up certain special defenses attacking the validity of intervenors' claim
against the wife, which they are clearly without interest to urge, being
creditors of the husband only, and claiming nothing against, or in right
of, the wife.

We shall consider the questions presented by these issues and the
evidence taken thereunder, in the following order, viz:

1st. Was the Jackson's Point plantation (with the revenues of
which the plaintiff claims to have made the payments on account of the
property), the paraphernal property of Mrs. Jackson? We think there
can be no question that it was. The evidence fully establishes that the
property originally belonged to Ralph Miller, the step-father of plaintiff.
Having borrowed money from Hoover, to secure its payment, Miller
transferred to him the title to this plantation. Having paid Hoover,

and desiring to present the plantation to Mrs. Jackson, then married, he directed Hoover to convey the property directly to her, which was done. Although in the form of an onerous title, this constituted it paraphernal property, as much so as if Miller had taken a reconveyance from Hoover to himself, and then made a donation of it to his daughter. Such was the opinion of our predecessors, as expressed in the case of Mrs. Jackson vs. Her Husband. Op. Bk.

2d. Was the Point plantation administered by the wife, separately and alone, in such manner as to preserve the paraphernal character of the revenues, and to prevent their falling into the community?

The evidence conclusively shows that Mrs. Jackson administered the plantation, in her own name, her husband acting as her agent by virtue of procurations which she was careful always to prepare and to deposit with her merchants, who are shown to have recognized her authority as principal in all transactions, and the authority of her husband solely as her mandatary. The accounts with the successive merchants were always kept in her name; she was credited with all its revenues and charged with all its expenses. Her husband, who conducted other plantations for his own account, kept his own accounts with the same merchants entirely separate from the wife's plantation accounts.

The Code emphatically declares that "the wife has the right to administer personally her paraphernal property without the assistance of her husband." Rev. C. C. 2384.

The terms, "without assistance," as used in this article, mean, unquestionably, *without his control, without the necessity of being thereunto authorized by him,* as is the case with many of her acts. It is not incompatible with her personal administration that she should avail herself of the assistance of her husband, if he is willing to render it, provided he act under her authority and merely as her proclaimed agent. Such acts, though performed by him, are still the acts of the wife, under the maxim " *qui facit per alium, facit per se.*" With regard to the administration of her paraphernal property, when she chooses to retain it, a married woman has all the powers of a *feme sole,* including the power to employ agents to aid and represent her in reference thereto. See Reynolds vs. Rowley, 2 A. 893.

Dodd vs. Orillon, 14 A. 68.

Jordan vs. Anderson, 29 A. 749.

Her right to employ her husband as her agent, when she is separate from him in property, was long since recognized.

Barataria vs. Field, 17 La. 426.

And it has been distinctly decided that even during the existence of the community, the wife may personally administer her paraphernal

property through the agency of the husband, without thereby forfeiting the paraphernal character of the revenues.

Lauve vs. Sheriff, 17 La. 183.

The learned counsel for defendants, though he does not in terms refer to or discuss this last case, yet evidently repudiates its authority, as being in conflict with the provisions of articles 2385 and 2386, Rev. C. C., providing, in substance, that paraphernal property, " which is not administered by the wife separately and alone," is considered to be administered by the husband; and that, when so administered by him, or even by him and the wife indifferently, the fruits pass into the community. We can perceive no conflict or inconsistency.

The wife, as we have seen, has the absolute right to administer her paraphernalia "separately and alone." She may, at her option, exercise this right, or she may leave the administration to her husband. If she have left the administration to her husband she may withdraw it from him when she chooses. Art. 2387. What is meant by the wife's administration "separately and alone," is the retention of the administration under her sole, separate and exclusive control and authority, with the view of making the revenues her own. What is meant by leaving the administration to her husband is the exercise of a voluntary election, by which she abandons her own right of authority and control and suffers the husband to manage, not as her agent and subject to her authority, but as if the property were his own. So long as the acts of the spouses make it clear and certain that the wife intends to reserve the administration to herself and for her own benefit, and to permit no acts to be done in reference thereto except by herself either in person or through properly constituted agents, and that the husband does not assume to interfere in the administration except as the express and open agent of the wife, we can see nothing to prevent the administration from being considered as that of the wife "separately and alone," in the sense of the law. As, with reference to such administration, the wife has all the powers of a *feme sole,* we find nothing in the law preventing her from employing agents, and nothing restraining her from employing her husband as such agent, provided the agency be express, public, and clearly proved. We have carefully examined all the authorities quoted by defendants' counsel, (23 A. 198 ; 21 A. 344; 20 A. 208; 18 A. 106; 17 La. 299; 9 A. 347; 2 A. 763; 11 R. 447), and find nothing inconsistent with this doctrine. In none of them did the intention of the wife to retain her separate administration appear, nor did it appear that the acts of the husband were done under the express power of attorney of the wife.

We, therefore, conclude that, under the facts disclosed by the record, the revenues of the Point plantation were paraphernal funds of plaintiff.

3d. Was the sale of the property now in controversy by Scott to Mrs. Jackson a real and *bona fide* transaction, or was it, as alleged by defendants, a purchase by W. L. Jackson for his own account, and with his own means, and was the placing of the title in the name of his wife a mere fiction, intended to cover up his property from his creditors?

This question may be summarily disposed of. The theory of the defendants find, in the evidence, not the slightest support that we can discover. Whatever other objections the plaintiff's title may encounter, we find nothing in the record to raise a doubt that it was the intention of all the parties to this transaction, *ab initio* and throughout, that Mrs. Jackson should acquire and hold this property as her separate paraphernal estate. Contrary suggestions are supported only by the merest surmises and assumptions based simply on alleged suppressions of evidence not brought home to plaintiff, or even to her husband—assumptions improbable in themselves, and flatly contradicted by every fact and circumstance in the case as established by the testimony not only of the plaintiff, but of other disinterested witnesses. Whether we assume the hypothesis of plaintiff's counsel, that Jackson was rich, and owed no debts, or that of defendant's counsel, that he was deeply involved, the inference of defendant's counsel would find no support from either. The first hypothesis would negative all motive for concealment. The last would suggest the strongest possible motive for having the homestead purchased by the wife, with her paraphernal funds, so as to protect it from his creditors.

4th. Were the payments made on account of the purchase price actually paid out of the plaintiff's paraphernal funds?

The plaintiff testifies that, being about to remove to New Orleans, and desiring a home of her own, she instructed John S. Scott, a member of the firm of Scott & Cage, her commission merchants, to purchase for her a house. During her absence at the North, on May 20th, 1869, Scott purchased the property in litigation for the sum of $25,500, and took the title in his own name. While at the North she purchased furniture for the house, and a carriage and horses, which were paid on her drafts by Scott & Cage, and charged to her Point plantation account. During the same period the insurance on the house and furniture were charged to her. On her return from the North, on the 18th of December, 1869, Scott made over the title to her, she repaying him the amount of the cash payment, $8500, by a draft in his favor, on Scott & Cage, and assuming the deferred payments.

In determining whether she had paraphernal funds under her control to make this cash payment, and whether it was made out of the same, we have nothing to do with anything, except the state of her accounts, on December 18th, 1869, the day on which she actually acquired

the property, and on which the cash payment was made. With her relations to the property prior to that date, under the merely verbal directions given to Scott to buy, we have no concern. Scott acted in his own name in the purchase, made the cash payment himself, gave his own notes for the deferred price, and took the title to himself. This gave Mrs. Jackson no legal title, and no equitable title capable of being enforced.

What was the state of Mrs. Jackson's account on the 18th of December, 1869 ? Whatever else is missing, we have the ledger of Scott & Cage containing her Point plantation account from August 16th, 1869, to January, 1870; and after charging herewith between four and five thousand dollars paid on account of furniture, etc., it appears that on December 18th, there was actually to her credit a sum of about seven thousand dollars. After charging her on that day with the $8,500 paid to Scott, the account was closed with a debit against her of only $1630. Her crop, however, had not then been all disposed of. The new firm of Scott & Jackson began operations in January, 1870, and her account was continued on their books. In January and February that firm made further sales of her crop, and, after charging her with the balance from Scott & Cage, their account showed to her credit, on March 31st, 1870, a balance of $3434 14.

It seems to us that this places it beyond controversy, that on the 18th December, 1869, Mrs Jackson had under her control paraphernal funds, ample to make the cash payment of $8500, and that she did pay it out of the same.

The verity of the items on the ledger account of Scott & Cage is vehemently assailed by defendants' counsel, and charges are made of erasures and false entries. These charges are, however, sustained by no evidence, and are conclusively rebutted by the testimony of the bookkeepers who had charge of the books.

The defendants also complain that the book of Scott & Cage, showing the account of Mrs. Jackson prior to August 16th, 1869, and from which is taken the balance with which the ledger account opens, is missing, and not produced ; that the page of the journal which contains the original entry of the draft in favor of Scott, has been torn out of the book, and that the ledger accounts of both Scott & Jackson have been torn out. They complain that these suppressions and mutilations have been made in the interest of plaintiff, to conceal evidence, and that the lost pages would show that the property was really purchased by W. L. Jackson. We can discover no principle upon which we can hold Mrs. Jackson responsible for these mutilations, with which neither she nor her husband is proved to have had anything to do. Nor is there a scintilla of evidence to show that they were made in her interest.

Neither can we see how the missing pages could possibly establish the inferences suggested by counsel, unless they should prove that the entries on the ledger account were false and fraudulent, which hypothesis is absolutely excluded by the testimony of the book-keepers, without whose connivance such fraud could not be perpetrated. After carefully considering the skillful and ingenious arguments of counsel, and weighing the suspicious circumstances to which they call attention, we can find no justification for impugning the correctness of the ledger account of Scott & Cage, or refusing credence to the testimony of unimpeached witnesses.

So much for the cash payment. Subsequently, a further payment of $9000 was made on account of the price, which we are fully satisfied, from the evidence, was made by Mrs. Jackson out of her paraphernal funds. We announce our conclusion on this question of fact without more particular discussion, because the question was before our predecessors in the case of Mrs. Jackson vs. Her Husband ; and, as to this payment, they announced the same conclusion reached by the District Judge and by ourselves.

5th. It only remains to determine whether the title of the wife to the property in question as paraphernal property, is impaired or destroyed by the fact that her purchase was made partly on credit.

To the general rule that estates purchased in the name of either spouse during the existence of the community become community property, there exists a recognized and well established exception in the case of a purchase made in the name of the wife, with the avowed intention of acquiring for her separate benefit, and paid for out of her paraphernal funds.

The wife has the right to invest her paraphernal funds, and to acquire property as the result of such investment.

From a thorough examination of our reports, we find no case holding that a wife having sufficient paraphernal means to make a purchase, is debarred from availing herself of the usual terms of credit, or forfeits her right by accepting such terms.

On the other hand, we find several cases in which the wife's title was protected where she had purchased partly for cash and partly on credit, on showing that the cash paid was paraphernal, and that she had paraphernal means to meet the credits.

See Metcalf vs. Clark, 8 An. 284.

Cockburn vs. Wilson, 20 An. 40.

Succession of Van Rensalaer, 6 An. 803.

Squier vs. Stockton, 5 An. 742.

Stroud vs. Humble, 2 An. 930.

See analogous case, Jordan vs. Anderson, 29 An. 749.

There are other cases where similar purchases have been considered and have been overthrown on grounds entirely distinct from the credit character of the transaction.

Shaw vs. Hill, 20 An. 532.

Bouligny vs. Fortier, 16 An. 209.

In the case of Mrs. Jackson vs. Her Husband, No. 5979 on the docket of this Court, our predecessors had this very title under consideration on a rule taken by the plaintiff upon the present defendants to show cause why their judicial mortgages as judgment creditors of her husband should not be decreed inoperative as encumbrances upon this property therein claimed as her paraphernal property. That case presented the same issues as those involved here. Had the Court been of the opinion that the paraphernal title of plaintiff was destroyed by the credit terms of the purchase, they would have so decided, and the present controversy would never have arisen. But the Court confined its examination to the question as to whether plaintiff had proved that the payments made on account had really been made by plaintiff out of her paraphernal funds. Finding that the proof then submitted was not sufficient as to the cash payment, they merely *nonsuited* the plaintiff. The conclusion is irresistible that, had the proof on that point been sufficient, the Court would have maintained plaintiff's rule. Else, why the mere nonsuit? We consider this decision as equivalent to a direct authority in favor of plaintiff on the present issue.

We think the doctrine is correctly laid down in the case of Bouligny vs. Fortier, 16 An. 214, that " the wife is required, not only to prove that she had paraphernal effects at her disposal, but also that they were ample to enable her, *reasonably at least*, to make the new acquisition." This language would be absurd, if the Court had considered that the purchase by the wife could only be maintained when she had actually paid in cash, out of paraphernal funds in hand, for the property purchased.

In the present case, at the moment of the purchase, the plaintiff had actually in hand more than $8500 in money, and disposable crops purely paraphernal. She was the owner of a valuable plantation yielding large revenues, fully justifying her in the reasonable anticipation that she would have an equal or greater sum at her disposal every year. She desired to purchase a home. Was she compelled to find one that could be purchased at exactly $8500 or less? Were not her paraphernal property and revenues " ample to enable her, reasonably at least," to purchase a home for $25,500, when her vendor was willing to accept the $8500 as a cash payment, and credit her for the balance? We think she had. The transaction was, in no sense, a "wild and ruinous speculation," such as those reprobated by the Court in Bouligny vs.

Fortier. It was a reasonable business transaction, such as any person in the pecuniary circumstances of the plaintiff might well have engaged in without the charge even of imprudence. At all events, she had the right to do with the $8500 what she pleased. There was no reasonable chance of her losing more than that amount by any decrease in the value of the property purchased. If, however, there should be a greater decline, her revenues were ample to meet it. In point of fact, she has since paid out of those revenues $9000 more on the price, leaving now due only the $7000 note of intervenors herein. Neither the husband nor the community has ever paid a cent on the property, and we can see no possible reason, equity or law, in allowing his creditors to take the property so nearly paid for by the wife, in satisfaction of their debts, and thus impose upon the wife the loss of her entire investment.

It is difficult to lay down precise rules as to the limits within which the wife's liberty to purchase on credit should be restricted, but we think the following general propositions are reasonable, viz: 1st. It should be regarded as essential that the wife should have *some* paraphernal funds to invest, because such investment is the foundation of her right to purchase.

2d. The cash so invested should bear such fair proportion to the total price of the purchase, as to render it reasonably certain that the property purchased would furnish sufficient security for the credit portion of the price.

3d. The wife's paraphernal property and revenues should be ample to enable her to make the acquisition, with the reasonable expectation of being able to meet the deferred payments.

These circumstances concurring, as they do in the present case, we see no reason for defeating the wife's rights under such a purchase, where all the other requirements of the law are complied with.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be affirmed, and that appellants pay costs of this appeal.

Levy, J., absent.

Rehearing refused.